**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAMEATRIA FELICE GRIFFIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 C 3258** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Lameatria Felice Griffin ("Griffin" or "claimant") has filed a motion for summary judgment [19] seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner").  Although the Commissioner found Griffin disabled from May 2008 through June 2009, the Commissioner denied Griffin's claim for disability insurance benefits ("DIB") under the Social Security Act ("the Act"), 42 U.S.C. § 416(i), from July 1, 2009 and beyond.  The Commissioner has filed a cross-motion for summary judgment [24] asking the Court to uphold the previous decision.  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, claimant's motion for summary judgment [19] is granted in part and denied in part.

**I.      BACKGROUND**

**A.      Procedural History**

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

On October 16, 2008, Griffin filed an application for disability insurance benefits, alleging she has been disabled since March 27, 2008 due to cervical disc disease, lumbar spine scoliosis, and degenerative disc disease.[2] (R. 152-160, 200.) Griffin's claims were denied initially on March 9, 2009, and upon reconsideration on August 21, 2009. (R. 91-95, 97-101.) Griffin filed a timely request for a hearing on September 18, 2009. (R. 107-08.) On October 21, 2010, Griffin appeared with counsel for a hearing before Administrative Law Judge ("ALJ") Joel G. Fina. (R. 22-68.)

On November 23, 2010, the ALJ issued a partially favorable decision, finding Griffin disabled beginning on May 12, 2008 and ending on July 1, 2009, when she experienced medical improvement. (R. 73-86.) Griffin filed a timely request for review on January 20, 2011. (R. 21.) On March 23, 2012, the Appeals Council denied Griffin's request, at which point the ALJ's decision became the final decision of the Commissioner. (R. 1-3.) Griffin subsequently filed this action in the District Court. The parties consented to this Court's jurisdiction [8] pursuant to 28 U.S.C. § 636(c).

**B.    Medical Evidence**

**1.    Treating Physicians**

The administrative record reveals that Griffin sought treatment from Dr. Imelda Dawis (erroneously identified by the ALJ as Dr. "Davis") on March 18, 2008 for back and neck pain accompanied by numbness and tingling in her upper extremities and legs.[3] (R. 566.) Bone density testing in late March 2008 revealed Griffin suffered from

---

[2] Griffin also filed for Supplemental Security Income ("SSI") benefits on October 16, 2008. (R. 161-63.) However, it does not appear that her request for SSI advanced to the hearing stage.

[3] Over the course of the next two and a half years, Griffin would see Dr. Dawis every one to two months, primarily for pain medication and family planning services. (*See* R. 566-86.)

osteopenia.  (R. 612.)  Nerve conduction testing yielded "essentially normal" results.  (R. 614.)

On May 12, 2008, a MRI of the cervical spine revealed, among other things, "C3-4 to C5-6 degenerative disc disease which abuts the ventral thecal sac and cord as well as mildly indents the cord."  (R. 376-77.)  Dr. Dawis referred Griffin to the Illinois Neuro-Spine Center at Rush-Copley Medical Center ("Rush-Copley").  (R. 435.)

Griffin saw Dr. Daniel Laich at Rush-Copley on July 24, 2008.  (R. 441-47.)  She complained of neck pain, right arm pain, and lower back pain extending down her right leg.  (R. 441.)  Dr. Laich ordered additional imaging and recommended physical therapy, cervical epidural steorid injections, and lumbar facet injections.  (R. 446-47.)  Imaging of the cervical spine on July 30, 2008 revealed mild cervical spondylosis with no significant interval change since May 12, 2008.  (R. 284.)  Imaging of the lumbar spine showed minimal scoliosis, disc bulging, and mild bilateral foramina and canal stenosis at some levels.  (R. 286.)

In August 2008, at Dr. Laich's recommendation, Griffin began undergoing treatment with Dr. Mohammad A. Khan at the Rush-Copley pain clinic.  Dr. Khan's records from Griffin's August 11, 2008 visit reveal that her complaints consisted of back pain, mainly localized in the lower back, and pain in the neck extending down to the right arms and fingers.  (R. 361.)  Griffin reported that her back pain ranged from a 4/10 to a 10/10 at its worse.  (*Id.*)  Her neck pain ranged from a 2/10 to 3/10.  (*Id.*)  Dr. Khan noted that claimant's pain was somewhat alleviated by Vicodin.  (*Id.*)

Dr. Kahn's physical examination revealed moderate tenderness over the right paravertebral muscle in the neck and severe tenderness over the paravertebral muscles

bilaterally in the lower back.  (R. 362.)  Dr. Kahn assessed chronic low-back pain secondary to facet joint arthropathy, lumbar radiculitis and discogenic pain, and chronic neck pain secondary to cervical radiculitis and cervical facet joint arthropathy.  (*Id.*)  Dr. Kahn initiated a treatment plan consisting of a series of injections for her neck and back pain.  (R. 361-63.)  Claimant continued to see Dr. Khan for cervical and lumbar facet joint injections from August through October of 2008.  (R. 364-71.)

On October 20, 2008, Griffin presented to the Rush-Copley emergency room complaining of back pain.  (R. 294-95.)  She was given information regarding a lumbo-sacral strain and prescribed Ultram and Vicodin.  (*Id.*)

At some point in October 2008, Griffin decided to undergo an anterior cervical disc fusion at levels C4 through C7 because the physical therapy and injections had not entirely relieved her pain and weakness.  (R. 512.)  Dr. Laich performed that surgery on November 12, 2008.  (R. 315-17.)  The final pathological findings were consistent with degenerative disc disease.  (R. 312-13.)  Post-surgery imaging revealed normal alignment.  (R. 387.)  During her recovery, Griffin underwent physical therapy and occupational therapy evaluations.  (R. 322-28.)  The therapists noted that her rehabilitation potential was "good."  (R. 324, 327.)

On December 12, 2008, claimant returned to Rush-Copley for a follow-up appointment with Dr. Laich.  (R. 421-22.)  She complained that her lower back pain had continued to come and go.  (R. 421.)  According to Dr. Laich's notes, Griffin stated she could sit in a chair as long as she likes, but pain prevented her from standing for more than thirty minutes.  (*Id.*)  Imaging revealed that the surgical hardware remained intact.  (R. 386.)  Dr. Laich recommended that claimant return in two months.  (R. 422.)

By February 12, 2009, imaging revealed "significant L4-5 and L5-S1 degenerative disc disease."  (R. 351, 413.)  At an appointment with Dr. Laich that same day, Griffin complained of pain in her lower back, hips, and legs, moderately relieved by medication and sitting down.  (R. 410.)  Griffin demonstrated restricted flexion, extension, rotation, and lateral bending of her neck.  (R. 411.)  She had mild lower back pain at flexion and extension.  (*Id.*)  Dr. Laich recommended physical therapy as well as lumbar injections.  (R. 413.)  He also noted "L4-5 and L5-S1 decompression and reconstruction" as a "surgical consideration."  (*Id.*)

On February 27, 2009, claimant returned to Dr. Khan for another injection in her lower back.  (R. 372.)  Dr. Khan's notes state that although claimant's neck pain had improved post-surgery, her lower back pain had persisted.  (*Id.*)  The record reveals that claimant failed to show up to her next two March appointments with Dr. Khan.  (R. 545.)

On March 11, 2009, Griffin returned to Rush-Copley for a physical therapy evaluation.  (R. 345-48.)  She explained that her right-side pain had improved since the surgery, but that she now suffered from left-side weakness of the leg, hip, and hand.  (R. 345.)  She complained of difficulty making a fist with her left hand.  (*Id.*)  Griffin claimed she could stand and walk for twenty to thirty minutes before needing to sit down.  (R. 345-46.)  She explained that she needed surgery for her lumbar spine, but was first attempting physical therapy and injections.  (R. 345.)

The physical therapist assessed decreased range of motion in the lumbar spine, and noted tenderness and pain with palpitation in certain areas.  (R. 346.)  Muscle strength scores ranged from "3+" to 5/5.  (R. 347.)  The physical therapist recommended bi-weekly sessions for four to six weeks and provided claimant with

home exercises.  (R. 347-48.)  The therapist noted that claimant's prognosis was "fair to fair plus" to meet her goals.  (R. 348.)

Griffin returned to Rush-Copley on May 11, 2009 for an appointment with Dr. Laich.  (R. 397-400.)  During that appointment, Griffin reported that her condition had improved since her initial visit and she rated her average pain at a three out of ten.  (R. 402-403.)  Specifically, Griffin explained that while she still could not stand for more than thirty minutes or walk more than a mile, she could sit in a chair for long periods of time and experienced moderate relief from painkillers.  (R. 397.)  After conducting a physical examination, Dr. Laich noted that claimant had a normal gait and did not indicate low back pain at flexion, extension, or lateral bends.  (R. 398.)  Dr. Laich did note that Griffin could only bend to thigh level, and was restricted to 85% in rotating, extending, and bending her neck.  (*Id.*)  Motor strength had increased to five out of five in all documented areas.  (R. 398-99.)

Dr. Laich assessed episodic cervical and left upper extremity pain, poor posture at cervical thoracic, and lumbar degenerative disc disease at L4-5, L5-S1.  (R. 399.)  Dr. Laich scheduled a follow-up visit in six months and recommended continued physical therapy, and an MRI and CT scan post discography if clinically necessary.  (R. 400.)

On June 11, 2009, claimant returned to Dr. Khan for a right lumbar epidural steroid injection, her first in four months.  (R. 374-75.)  It does not appear that Griffin returned to Dr. Khan for any more injections after this appointment.

Following her surgery, claimant continued to see Dr. Dawis once every few months.  Beginning in June 2009, claimant began seeing Dr. Dawis more frequently.  On June 15, 2009, Dr. Dawis noted that Griffin's neck pain had improved, but that she

continued to suffer from lower back pain. (R. 575.) On June 29, 2009, Dr. Dawis commented that claimant was unable to go back to work due to recurrent lower back pain, for which she was anticipating undergoing another surgery, as soon as she feels well enough. (R. 354, 575.) A month later, on July 27, 2009, Dr. Dawis indicated that Griffin was "scared" to undergo a lumbar spinal surgery. (R. 576.) By September 2009, Griffin was feeling "lousy" because she was unable to do what she wanted to do and lacked energy. (R. 577.)

On October 19, 2009, Dr. Dawis noted muscle spasms and a restricted range of motion. (R. 579.) In a handwritten letter, Dr. Dawis again noted that Griffin's lower back pain was the reason she remained unable to work. (R. 600-01.) Claimant continued to see Dr. Dawis and complain of either back or neck pain on a monthly basis until September 2010, when Dr. Dawis completed the residual functional capacity ("RFC") assessment discussed below. (R. 551-53.)

Griffin returned to see Dr. Laich on April 15, 2010. (R. 488-91.) At that time, Griffin explained that her pain continued to come and go, but had decreased in intensity. (R. 488.) She stated that she is unable to walk more than a half a mile, stand for more than one hour, or sit for more than one hour. (*Id.*) Her pain is relieved with medication and by lying down. (*Id.*) Among other things, Dr. Laich documented restricted rotation of the neck and "right SI trigger point." (R. 489.) He assessed both cervical and sacroiliac joint pain, and recommended physical therapy, an EMG of the bilateral upper extremities, and a "CT/myelogram pending clinical course." (R. 490.)

Griffin saw a physical therapist at Provena Mercy Medical Center several times between April 22, 2010 and June 28, 2010. (R. 624-43.) The therapist noted that

claimant's symptoms improved over the course of therapy and that claimant demonstrated an increased range of motion in her neck. (R. 643.) It appears that Griffin presented to the Provena Mercy Center emergency room on July 27, 2010 for back and neck pain following a physical altercation. (R. 649.) She was discharged with a cervical strain.[4] (R. 654.)

Dr. Dawis completed a Physical Residual Functional Capacity ("RFC") Questionnaire on September 13, 2010. (R. 551-53.) Dr. Dawis indicated that she had seen Griffin on about a monthly basis since March of 2008. (R. 551.) She diagnosed cervical and lumbar disc disease with a "guarded" prognosis. (*Id.*) Dr. Dawis described Griffin's symptoms as "daily pain on entire spinal region" accompanied with numbness and tingling. (*Id.*) More specifically, she described the pain as "recurrent on neck, lower back on slight [range of motion]." (*Id.*) When asked to identify clinical findings and objective signs of Griffin's symptoms, Dr. Dawis stated: "inability to move around [without] pain." (*Id.*) She noted that she had prescribed Vicodin and advised rest. (*Id.*)

Dr. Dawis concluded that Griffin could sit for fifteen minutes at one time before needing to get up, and stand/walk for thirty minutes before needing to sit down or walk around. (R. 552.) Dr. Dawis stated that Griffin could sit, stand, and walk for less than two hours in an eight hour work day, and would need a job that permitted leg elevation, shifting positions at will, and unscheduled breaks every fifteen minutes. (*Id.*) According to Dr. Dawis, Griffin could "rarely" lift less than ten pounds. (R. 553.) Furthermore, Dr.

---

[4] Records also reveal that Griffin was admitted to the Provena emergency room on May 26, 2010 for elbow pain after attempting to break up a fight. (R. 670-71.) In any event, it does not appear that the physical therapy or emergency room records were before the ALJ at the administrative level.

Dawis concluded that because of the pain in Griffin's upper extremities, she could only use her arms and hands twenty to thirty percent of the workday, and use her fingers for fine manipulations about ten to fifteen percent of the day.  (*Id.*)  Lastly, Dr. Dawis noted that Griffin would have good days and bad days, and would likely be absent more than four days per month.  (*Id.*)

### 2. Agency Consultants

On February 17, 2009, Dr. Roopa K. Karri conducted a consultative examination for the Bureau of Disability Determination Services.  (R. 334-38.)  Griffin complained of pain in her hands, which spreads to the whole body and neck.  (R. 334-35.)  Dr. Karri noted that Griffin found it difficult to write and stir while cooking, but was able to do chores with the help of her family members.  (R. 335.)  Griffin further complained of numbness and spasms in her left hand, low back pain radiating to her hips, and numbness in her left foot.  (*Id.*)  Medication and steroid shots had provided her some relief.  (*Id.*)  Griffin described a two year history of asthma, exacerbated by dust and cold weather.  (*Id.*)

Dr. Karri's physical exam revealed mostly unremarkable results.  (R. 336.)  Dr. Karri reported that claimant was able to get on and off the exam table; walk fifty feet without support; could turn doorknobs, write, pick up coins, make fists and oppose fingers; and had normal range of motion in the lumbar spine, elbows, wrists, hips, knees, and ankles.  (*Id.*)  Range of motion in the shoulders was normal but slow.  (*Id.*) Testing of range of motion of the cervical spine was deferred because Griffin was wearing a cervical collar due to her recent surgery.  (*Id.*)  Dr. Karri also noted that while there was some tenderness in the cervical and upper thoracic spine, there was no

tenderness in the lumbar spine.  (*Id.*)  Grip strength in the right hand was 5/5 and 4/5 in the left hand.  (*Id.*)  Strength of her left upper limb was 4+/5 and 5/5 in all other limbs. (R. 336-37.)  Straight leg raise test was negative.  (R. 336.)

On March 4, 2009, Dr. Virgilio Palapil completed a physical RFC assessment. (R. 554-61.)  Dr. Palapil concluded that claimant could occasionally lift and carry twenty pounds, frequently ten pounds, could stand and walk with normal breaks for about six hours in an eight-hour day, and could sit for about six hours.  (R. 555.)  Dr. Palapil also found that claimant could only occasionally crouch, crawl, and climb ladders, ropes, and scaffolds, but could frequently stoop.  (R. 556.)  For support of these conclusions, Dr. Palapil cited Griffin's normal range of motion and lack of tenderness in the lumbar spine, negative straight leg test, and the tenderness in her cervical and upper thoracic spine. (R. 555-56.)  Dr. Palapil found no other postural, manipulative, visual, communicative, or environmental limitations.  (R. 556-58.)

Dr. Palapil found claimant's allegations to be partially credible based on the objective evidence showing a history of back problems.  (R. 561.)  However, he specifically called into question Griffin's allegation that she required a walker based on Dr. Karri's report indicating she was able to walk fifty feet without the use of an assistive device.  (*Id.*)  On August 13, 2009, Dr. Vidya Madala affirmed the RFC assessment of Dr. Palapil.  (R. 355-57.)

The record reveals that in August of 2009, Griffin was assessed by the Department of Human Services to determine whether she qualified for assistive services.  (R. 495-502.)  During that assessment, Griffin complained of difficulties in certain daily activities, such as dressing, grooming, preparing meals, and housework.

10

(R. 498-99.)

### C. Claimant's Testimony

Griffin appeared before the ALJ on October 21, 2010 and testified as follows.  At the time of the hearing, Griffin was thirty-nine years old, five feet seven inches tall, and weighed 154 pounds.  (R. 27.)  She did not graduate high school or get her GED.  (*Id.*) Griffin has not worked since 2008 when she left her job as a picker and packer at Eby Brown.  (R. 27-28.)  Griffin explained that she stopped working when she started experiencing pain in her hands and neck.  (R. 31.)  Griffin received unemployment compensation from Eby Brown, but did not apply for other work as required because she "couldn't do it."  (R. 32.)  Griffin further testified that she had to stop babysitting for her nephew, which she did for approximately a year.  (R. 29-31.)

Griffin currently lives in an apartment with her two sons. (R. 27.)  She explained that her daughter is getting paid through "the home health care people" to take care of her and help with chores such as cooking, cleaning, laundry, and driving her kids to school.  (R. 33, 39.)  Griffin cooks for her children and washes dishes only about twice a week.  (R. 33.)  Griffin does not usually drive because she cannot turn her head around due to a stiff neck.  (R. 39-40.)  Additionally, her asthma prevents her from going up and down the stairs to do her laundry.  (R. 39.)

Griffin spends most of her time at home laying in bed reading and watching television.  (R. 37.)  She is able to rest against her headboard.  (*Id.*)  According to Griffin, the only social activity she does on a regular basis is attend church.  (R. 36.)  On some days she cannot get out of bed because her legs and hands "lock up."  (R. 33.) On those days, Griffin's daughter does everything for her.  (R. 37.)  On her good days,

11

Griffin tries to get up and move around a little after laying in bed for a couple of hours. (*Id.*)  Griffin testified that she can only stand or walk for fifteen to twenty minutes before she has to sit down.  (R. 34.)  She can sit for fifteen to thirty minutes before she starts getting stiff and has to walk around to prevent her legs from locking up.  (R. 34-35.) She also suffers from tingling in the bottom of her feet.  (R. 35.)  At the hearing, Griffin explained she was experiencing a "throbbing" pain in her right arm extending down her leg to the bottom of her feet, which she rated a seven to eight out of ten.  (R. 35-36.)

Griffin also testified that her hands cramp up when she uses them.  (R. 38.)  She can only stir while cooking for about ten minutes and hold a book for about an hour before she experiences pain and cramping and has to stop and "rub it out."  (R. 38-39.) She testified that she suffers from pain in her left hand "every now and then," but it is not as bad as in the right hand.  (R. 37-38.)

Griffin testified that she is on several medications, specifically hydrocodone, muscle relaxers, calcium pills, and Benadryl for sleeping.  (R. 35.)  She also stated that she smokes about one cigarette per day, but does not use alcohol or other drugs.  (R. 34, 36.)

### D.    Medical Expert's Testimony

Medical Expert ("ME") Dr. Ashok Jilhewar also testified at the hearing.  After confirming that the record was sufficient for the ME to reach a conclusion as to Griffin's medical conditions, the ALJ asked what conditions have existed since March 27, 2008, the alleged onset date.  (R. 43.)  The ME summarized the medical records as follows.

ME Jilhewar described Griffin's history of degenerative disc disease of the cervical spine as evidenced by the May 12, 2008 MRI.  (R. 43.)  He explained that

Griffin received facet joint injections, which provided only short-term relief. (*Id.*) The

ME acknowledged Griffin's November 12, 2008 cervical discectomy and fusion. (R. 42.)

He noted that at the May 11, 2009 follow-up appointment, the neurosurgeon stated that

Griffin had improved since prior visits and demonstrated motor strength of 5/5. (R. 43.)

The ME pointed out that Griffin's motor strength remained the same at the April 15,

2010 appointment. (*Id.*) By that appointment, the ME concluded that Griffin was doing

"quite satisfactory" as far as the cervical degenerative disc disease was concerned and

noted that there had been no specific management of that issue subsequent to that

date. (*Id.*)

The ME also described Griffin's history of degenerative disc of the lumbar spine

as documented by the July 30, 2008 MRI. (R. 44.) This condition resulted in several

steroid injections and an emergency room visit on October 20, 2008. (*Id.*) At the

evaluation on May 11, 2009, the neurosurgeon indicated that Griffin would need a

discogram to see the exact pathology of her pain. (*Id.*) However, the ME testified that

except for pain medication, he had not seen any further specific management of the

lumbar spine issue. (*Id.*) The ME further testified that he did not find any records

supporting Griffin's allegation of asthma. (R. 48, 52.)

The ALJ then asked the ME whether Griffin's impairments had met or equaled a

listing since March 27, 2008. (R. 45.) The ME testified that the claimant had not

consistently met listing 1.04(A) for degenerative disc disease of the cervical spine since

March 27, 2008 because the medical records did not evidence motor weakness on a

consistent basis.[5]  (R. 45-46.)  However, the ME testified that claimant did meet listing 1.04(A) for a closed period of time, beginning on May 12, 2008 and ending on June 30, 2009.[6]  (R. 46, 49-50.)

Next, the ALJ asked the ME whether Griffin had any functional limitations for the periods prior to and after the time during which she met the listing.  (R.  46.)  The ME first explained that although Griffin may have had symptoms prior to May 12, 2008, he was unable to comment on her physical capacity due to a lack of active management of those symptoms during that period.  (R. 46-47.)  As for the period beginning July 1, 2009, the ME concluded that Griffin experienced a medical improvement that affected her ability to perform work related activities.  (R. 48.)  Specifically, the ME found that Griffin could "sit indefinitely [without a sit/stand option] because there is no involvement of sacral iliac joint documented": lift and carry ten pounds occasionally and frequently; and stand for two hours in an eight-hour workday in half-hour increments.  (R. 47.)  He further opined that she could manage ramps frequently and stairs occasionally; could never climb ladders and ropes; could stoop and balance occasionally; and could never engage in activities like crawling, crouching, and kneeling.  (R. 47-48.)  He stated that if Griffin did in fact suffer from bronchial asthma, she would need to avoid constant exposure to pulmonary irritants.  (R. 48.)

---

[5]  Listing 1.04(A) includes disorders of the spine, resulting in compromise of a nerve root or the spinal cord with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."  20 C.F.R. Part 404, Subpt. P, App. 1.

[6]  The ME initially testified that the period closed on May 31, 2009.  (R. 46.)  The ME extended the period to June 30, 2009 after claimant's counsel pointed out that she received her last injection on June 11, 2009.  (R. 46, 49-50.)

The ME based his finding of medical improvement in part on the lack of "aggressive" treatment following the last steroid injection and the documentation of normal motor function by Dr. Laich. (R. 50-51.) He acknowledged that his RFC assessment differed than that of Dr. Dawis because he did not see clinical findings that would support a similar conclusion. (R. 48.)

### E. Vocational Expert's Testimony

Vocational Expert ("VE") Linda Gels also offered testimony at the hearing. The ALJ first asked the VE to classify claimant's past work. (R. 57.) VE Gels testified that claimant worked as a picker/packer, which she described as an order filler and classified as medium, unskilled work. (*Id.*) VE Gels also testified that claimant worked as a cleaner in a hospital at the medium, unskilled level, and as a babysitter, which is medium, semi-skilled work. (R. 58.)

The ALJ then asked VE Gels to consider a hypothetical individual of claimant's age, education, work experience, and skill set who could (1) lift ten pounds occasionally and frequently; (2) could stand or walk for up to two hours and sit for up to eight hours per eight-hour workday; (3) could never climb ladders, ropes, or scaffolds; (4) could frequently, but not constantly, climb ramps or stairs; (5) could occasionally balance and stoop; and (6) could never crouch, kneel, or crawl. (R. 58-59.) The ALJ asked the VE whether such an individual could perform claimant's past work. (R. 59.) VE Gels testified that such an individual would not be capable of performing claimant's past work because each of those positions would require lifting twenty pounds. (R. 59-60.)

The ALJ then asked VE Gales whether there was other work in the regional or national economy that an individual with the above described limitations could perform.

(R. 60.) VE Gales explained that a person who is limited to two hours of standing and walking could only perform sedentary work and, based on claimant's prior work experience, could only perform unskilled work. (*Id.*) Specifically, VE Gels stated that such an individual could perform functions in the "bench work" category of unskilled, sedentary work (assembler, tester, inspector, and packager), of which there are 3,000 positions state-wide. (R. 60-61.) VE Gels also explained that the individual could work as an order clerk, of which there are 1,500 positions. (R. 61.)

The ALJ then asked VE Gels whether her answer would change if the hypothetical person must also avoid concentrated exposure to pulmonary irritants. (R. 61.) VE Gels testified that her answer would remain the same because pulmonary irritants are not characteristic of the type of positions she identified. (R. 62.)

Next, the ALJ asked VE Gels whether a person who was unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, for a forty-hour work week would be precluded from full-time competitive work at all exertional levels. (R. 62.) VE Gels answered in the affirmative. (*Id.*) She explained that positions usually allow for ten to fifteen minute morning and afternoon breaks and a thirty minute lunch break, and that missing more than six days a year would not be tolerated. (*Id.*) She further testified that exceeding those customary break and absence limits on a regular basis would eliminate the jobs she previously cited, as well as all other jobs in the competitive work force. (R. 63.)

Griffin's attorney asked VE Gels what percentage of the day an individual in an assembler position would spend engaging in fine or gross manipulation work. (R. 64.) VE Gels testified that such work would take up two-thirds of the day. (*Id.*) She further

16

explained that there would be some expectation of a productivity requirement that the employee would be required to meet, which may or may not be a quantifiable quota. (R. 64-65.)  VE Gels opined that she did not think it would be tolerated if an employee consistently failed to meet that standard.  (*Id.*)  Lastly, the VE testified that a specialized seat for leg elevation would not likely be tolerated in the assembler and order clerk positions.  (R. 65-66.)

## II.     LEGAL ANALYSIS

### A.     Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  In making this substantial-evidence determination, we must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  Nevertheless, we will "conduct a critical review of the evidence" and will not affirm the Commissioner's decision "if it lacks evidentiary support or an adequate discussion of the issues."  (*Id.*)

While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  At a minimum, the ALJ must

"sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B.  Analysis under the Social Security Act**

In order to qualify for disability insurance benefits, a claimant must be "disabled" under the Act.  A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment…which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must make the following five-step inquiry: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.  *See* 20 C.F.R. § 404.1520(a); *Dixon,* 270 F.3d at 1176.  The claimant has the burden of establishing disability at steps one through four, after which the burden shifts to the Commissioner to show that the claimant is capable of performing work in the national economy.  *Zurawski v. Halter*, 243 F.3d 881, 886 (7th Cir. 2001).

The ALJ followed this five-step process.  At step one, the ALJ found that claimant had not engaged in substantial gainful activity since March 27, 2008, the alleged onset date.  (R. 80.)  Before moving on to step two, the ALJ concluded, based on Dr.

Jilhewar's testimony, that "there is insufficient documentary evidence" to establish whether claimant was disabled "for the time period beginning with the alleged onset date of March 27, 2008 through May 12, 2008." (R. 80-81.) Moving on, the ALJ concluded at step two that beginning May 12, 2008, the record established that the claimant had the following severe impairments: degenerative disc disease of the cervical spine, status post discectomy with fusion, degenerative disc disease of the lumbar spine, and asthma. (R. 81.)

At step three, the ALJ found that from May 12, 2008 through June 30, 2009, the severity of claimant's degenerative disc disease of the cervical spine equaled the criteria of Listing 1.04(A) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 81-82.) Therefore, the ALJ determined that claimant was "disabled" under the Act for that period of time. (*Id.*)

If, as here, the claimant is found disabled at any point in the five-step process, the ALJ must then determine whether the claimant's disability continues through the date of the decision. *See* 20 C.F.R. § 404.1594(a). In making this determination, the ALJ must follow a eight-step evaluation process: (1) whether the claimant is engaging in substantial gainful activity; (2) whether the claimant's impairments equal the criteria for a listed impairment; (3) whether medical improvement has occurred; (4) whether medical improvement is related to the ability to work; (5) whether an exception to medical improvement applies; (6) whether claimant's impairments in combination are severe; (7) whether the claimant can perform past relevant work based on her RFC; and (8) whether other work exists that the claimant can perform given her RFC and considering her age, education, and past work experience. 20 C.F.R. § 404.1594(f).

19

In applying this eight-step evaluation in our case, ALJ Fina found that beginning July 1, 2009, claimant experienced "medical improvement" and no longer had an impairment that equaled the criteria of 1.04(A) or any other listing.[7]  (R. 82.) Furthermore, the ALJ concluded that beginning July 1, 2009, claimant had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with certain exceptions. (R. 83-84.)  Specifically, the ALJ found that claimant could frequently climb ramps or stairs; could occasionally balance and stoop; could never climb ladders, ropes or scaffolds; could never crouch, kneel or crawl; and must avoid exposure to pulmonary irritants such as fumes, odors, dusts, and gases.  (*Id.*)

After considering the VE's testimony regarding claimant's RFC, age, education, and work experience, the ALJ determined that although claimant could not perform her past work, claimant was capable of making a successful adjustment to positions that exist in significant numbers in the national economy.  (R. 85-86.)  The ALJ specifically noted claimant was capable of performing the positions of "assembler" and "order clerk." (*Id.*)  As a result, the ALJ found that claimant's disability began on May 12, 2008 and ended on July 1, 2009.  (R. 86.)

Griffin now argues that the ALJ (1) failed to properly analyze Dr. Dawis' opinion; (2) failed to properly assess her RFC; and (3) improperly assessed her credibility.  We address each issue in turn below.

### C.    The ALJ Properly Assessed the Opinion of Claimant's Treating

---

[7]  "Medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled.  A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)."  20 C.F.R. § 404.1594(b)(1).

**Physician, Dr. Dawis.**

Griffin first contends that ALJ Fina failed to properly analyze Dr. Dawis' June 30, 2009 opinion that Griffin was unable to work and Dr. Dawis' September 13, 2010 RFC assessment, which was more restrictive than the RFC ultimately adopted by the ALJ. The Commissioner responds that the ALJ properly discounted Dr. Dawis' opinion because it lacked support in the way of clinical findings and was not supported by the overall medical evidence. The Commissioner also opines that Dr. Dawis' RFC assessment may have been influenced by a desire to help her patient obtain benefits.

Generally, the ALJ will give the opinion of a treating physician controlling weight because treating physicians are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(c)(2). However, "[a] treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'consistent with substantial evidence in the record.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (*quoting* 20 C.F.R. § 404.1527(c)(2)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ must always give "good reasons" for his determination as to the amount of weight given. 20 C.F.R. § 404.1527(c)(2). Nonetheless, the Seventh Circuit has held that an ALJ's decision to

discount a physician's opinion is subject to a very deferential, or "lax," standard of review. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). As long as the ALJ "minimally articulated" his reasoning, a reviewing court must allow that decision to stand. *Id.*

As an initial matter, we note, as did the Commissioner, that Dr. Dawis' opinion that Griffin was unable to work was not entitled to any special significance. It is well settled that such a conclusion is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d),(e); SSR 96-5P, 1996 WL 374183, at **2,5; *Dixon*, 270 F.3d at 1177 ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work.").

As for Dr. Dawis' RFC assessment, the ALJ explained that he afforded that opinion "little weight" because it was in "direct conflict with the testimony of the medical expert, Dr. Jilhewar," and because Dr. Dawis did "not provide any clinical findings to support her residual functional capacity assessment of the claimant, which includes rather restrictive limitations." (R. 84.) Further, the ALJ noted that there were no records subsequent to July 1, 2009 that demonstrate that the claimant had ongoing weakness in either her upper or lower extremities, as contemplated by Dr. Dawis. (*Id.*)

We conclude that the ALJ's reasoning satisfies the lax standard of review by which we are bound. Although the claimant is correct that a conflicting opinion of a non-examining source is alone an insufficient basis for rejecting a treating source's opinion, ALJ Fina offered more than that here. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Again, he noted that Dr. Dawis' RFC assessment lacked support in the way of clinical findings. Indeed, when asked on the RFC questionnaire what clinical findings

22

and objective signs supported her September 13, 2010 conclusions, Dr. Dawis simply responded: "inability to move around [without] pain," and her treatment notes provide little in the way of clinical testing. (R. 551.) Thus, as the ALJ reasoned, Dr. Dawis' RFC assessment appears to be primarily based on claimant's subjective complaints of pain, as opposed to objective findings.[8] As a result, the ALJ did not err in affording that opinion lesser weight. *See Ketelboeter*, 550 F.3d at 625 (finding that substantial evidence supported the ALJ's decision to give greater weight to the state-agency doctors' opinions than to that of claimant's treating physician, whose conclusions were based almost entirely on claimant's subjective complaints); *cf. Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Elsewhere in the opinion, the ALJ cited to the exhibit containing Dr. Dawis' treatment records and noted that Griffin had managed her symptoms with pain medication following her last injection with Dr. Kahn. (R. 84.) This demonstrates the ALJ's consideration of the nature of the treatment Dr. Dawis provided Griffin. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or

---

[8] We note that Dr. Dawis did submit various testing results from the time period during which the ALJ concluded Griffin met the listing. However, because the ALJ found medical improvement as of July 1, 2009, we are most concerned with the lack of clinical findings and objective testing from Dr. Dawis following that date.

ordered from specialists and independent laboratories."). And, although the ALJ did not

discuss every factor set forth in 20 C.F.R. § 1527(c)(2), he was not required to do so.

*See McCormick v. Astrue*, No. 11-C-0328, 2012 WL 1886508, at *12 (N.D. Ind. May 23,

2012) ("It is true that the regulation requires the ALJ to consider those six factors, but

his decision need only include 'good reasons' for the weight given to the [medical]

source's opinion rather than 'an exhaustive factor-by-factor analysis.'") (*quoting Hanson*

*v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011)); *see also*

*Elder,* 529 F.3d at 415-16 (affirming denial of benefits where ALJ discussed only two of

the factors laid out in 20 C.F.R. § 404.1527).

ALJ Fina minimally articulated his reasons for affording Dr. Dawis' opinion little

weight. As a result, remand is not required on this issue.

### D. The ALJ Failed to Build an Accurate and Logical Bridge From the Evidence to his Conclusion that Claimant had the RFC to Perform Sedentary Work.

Next, Griffin contends that ALJ Fina's RFC determination was improper because

he did not adequately address her alleged limitations. Griffin also calls into question the

ALJ's assessment of her credibility. The Commissioner argues generally that the ALJ's

credibility assessment and RFC determination are supported by substantial evidence.

Given the overlap of these two issues, we address them together.

Once the ALJ determines that a claimant's impairments could reasonably be

expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity,

persistence, or functionally limiting effects" of the claimant's symptoms. SSR 96-7p,

1996 WL 374186, at *2. When statements about such effects are not substantiated by

objective medical evidence, the ALJ must make a credibility determination based on the

entire case record. *Id.* In making a credibility determination, the ALJ should consider the following factors in addition to objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; (7) and any other factors concerning the individual's functional limitations. *Id.* at *3.

It is well settled that the court must afford the ALJ's credibility determination special deference because the ALJ is "in the best position to see and hear the witnesses and assess their forthrightness." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Consequently, we will reverse a credibility determination only if it is "patently wrong." *Zurawski*, 245 F.3d at 887. To be patently wrong, an ALJ's determination must lack "any explanation or support." *Elder,* 529 F.3d at 413-14; *see also* SSR 96-7p, 1996 WL 374186, at *2 (The ALJ's decision must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

With respect to the RFC assessment, a claimant's RFC is the most a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In assessing the RFC, the ALJ must consider all of the relevant evidence in the case record, including information about symptoms that might not be shown by objective medical evidence alone. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *5. A court will

uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Id.* at 592.

Here, we conclude that the ALJ's credibility determination lacked sufficient explanation and support in the record. After recognizing that claimant's medically determinable impairments could reasonably be expected to produce her alleged symptoms, ALJ Fina concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible beginning on July 1, 2009 to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (R. 83.)

As an initial matter, the Seventh Circuit has explained that boilerplate language similar to that used here may be cause for remand when not accompanied by a well-reasoned analysis. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). Unfortunately, while ALJ Fina alludes that his reasoning follows, what little reasoning he has provided fails to sufficiently support his conclusion.

First, the ALJ opined that "the objective medical evidence does not establish that the claimant would be precluded from performing sedentary work." (R. 84.) Though a lack of objective medical evidence can be "probative that a witness may be exaggerating her condition," *Powers,* 207 F.3d at 435-36, an "ALJ may not discredit claimant's subjective complaints of pain and limitations solely because of a lack of

corroborating objective medical evidence." *Doering v. Astrue*, No. 10 C 5730, 2012 WL 1418851, at *3 (N.D.Ill. Apr. 24, 2012) (*citing Bjornson v. Astrue*, 671 F.3d 640, 648 (7th Cir. 2012)).

Next, the ALJ commented on the "conservative" treatment Griffin had received for her back pain, namely pain medication and epidural injections (as opposed to a spinal cord stimulator or surgical intervention), and found that this treatment regimen undermined Griffin's complaints of severe limitations.  (R. 84.)  However, in reaching this conclusion, the ALJ improperly ignored notations in the record that surgical intervention of the lumbar spine had been considered and appeared to still be a treatment option even after Griffin's last steroid injection in June 2009.  (*See e.g.* R. 416, 576); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("[T]he ALJ may not simply ignore evidence.").

The ALJ also took issue with Griffin's claim that she could only sit for thirty minutes.  According to the ALJ, this testimony conflicted with Griffin's testimony that she could "lie down for a few hours and that she reads 'all the time' for leisure."  (R. 83.)  As Griffin argues, it is unclear how this testimony undermines her credibility or is internally inconsistent when sitting and lying down are separate and distinct body positions.

Further, in posing hypotheticals to the VE and forming his RFC assessment, the ALJ relied on the ME's testimony that Griffin could "sit indefinitely [without a sit/stand option] because there is no involvement of sacral iliac joint documented."  (R. 47.) However, the record does include references to the involvement of the sacral spine, and specifically to the sacroiliac joint, which relates to Griffin's ability to sit.  (*See, e.g.,* R. 294-95 (lumbo-sacral strain information provided to claimant), 304 (sacroiliac

27

arthropathy), 346 (tenderness along posterior superior iliac spine), 413 (significant degenerative disc disease at L5-S1), 490 (sacroiliac joint pain).)  Because sedentary positions generally require a person to sit for six hours of an eight hour workday, *see* SSR 83-10, 1983 WL 31251, at *5, the ALJ's failure to properly assess Griffin's credibility and the pertinent medical records on this issue warrants remand.

We also agree that the ALJ gave short shrift to Griffin's testimony regarding her daily activities and her hand spasms when assessing the RFC.  As Griffin argues, most sedentary jobs, and certainly those contemplated by the VE here, "require good use of the hands and fingers for repetitive hand-finger actions."  SSR 83-10, 1983 WL 31251, at *5.

Having failed to build a logical bridge between the evidence and the conclusion that Griffin can perform sedentary work, remand is required.

## III.  CONCLUSION

For the foregoing reasons, claimant's motion for summary judgment is granted in part and denied in part and the Commissioner's motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON
United States Magistrate Judge**


**Dated: May 29, 2013**

28